## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **LEVAIL GIVENS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.**   16-cv-303-MJR-SCW |
| | ) | |
| **DAVID VAUGHN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

### REPORT AND RECOMMENDATION

**WILLIAMS, Magistrate Judge:**

### INTRODUCTION

*Pro se* Plaintiff Levail Givens filed the present civil rights suit pursuant to 42 U.S.C. § 1983.   Plaintiff is an inmate currently incarcerated at Lawrence Correctional Center ("Lawrence"), alleging violations of his rights to religious exercise under the First Amendment and Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Plaintiff is a member of the Hebrew Israelite Congregation, and he alleges that officials at Lawrence are preventing him from practicing certain tenants of his religion.   This matter is before the Court on a Motion for Preliminary Injunction (Doc. 4) filed contemporaneously with Plaintiff's Complaint.   Plaintiff raises three primary issues in his Motion: (1) the availability of kosher diets; (2) the opportunity for him to participate in Sabbath services; and (3) the ability for Plaintiff to partake in certain feasts and celebrations.

A Response to the Motion, as well as, a Reply have both been filed, and the undersigned held an evidentiary hearing on Plaintiff's motion.   As such, this matter is now ripe for disposition.   For the reasons articulated below, the undersigned **RECOMMENDS** that the district judge **DENY** Plaintiff's Motion for Preliminary Injunction.

### BACKGROUND

Plaintiff is an inmate of the State of Illinois, incarcerated at Lawrence Correctional Center.   (Doc. 1, p. 1).   He is a member of the Hebrew Israelite Congregation ("Hebrew Israelite") (Doc. 4, p. 1), and as part of his faith, Plaintiff may only consume a kosher meal (Doc. 1, p. 16).   Plaintiff claims, however, that though he has been approved for a kosher tray by Lawrence officials, the tray he is receiving is not actually kosher.   (Doc. 59, p. 6 – 7).   He provides eight reasons for why his trays are not kosher.   First, he claims that the Saturday tray is not prepared before sundown on Friday.   (*Id.* at 9). Plaintiff testified that it is a violation of his faith to prepare food on a Saturday, and any food consumed that day must be prepared prior to sundown on Friday.   (*Id.*). According to Plaintiff, he was told by "supervisors" working in dietary as to when the Saturday trays were prepared.   (*Id.* at 58).   Plaintiff testified that he (and presumably other inmates) "inquir[ed] into [their] diets and ask[ed] them and…that's how [they] know certain things."   (*Id.* at 35).

Next, according to Plaintiff, the individuals preparing his trays, generally, should be adherents of the Torah.   (*Id.* at 36).   Plaintiff admitted, however, that he did not

know who specifically prepared the trays, and is making allegations based on what he has "heard".   (*Id.* at 35).

Third, Plaintiff claims that specific items on his tray, regardless of when it is served, are not kosher.   He claims that the bagels, tuna, and juice on his tray are not kosher because they do not come in a packaging with the universal kosher label on it. (*Id.* at 11, 13, 16).   In support of this claim, Plaintiff states that he was told by inmate workers that the workers were informed by dietary supervisors that some of these items did not come in Kosher marked packaging.   (*Id.* at 12).   Regarding the tuna, Plaintiff testified that he had been told by a dietary supervisor four years ago that the tuna on the kosher trays is not actually kosher.   (*Id.* at 13).

Fourth, Plaintiff takes issue with the onions and bell peppers provided by Lawrence.   He claims that, as a part of his religion, any cooked onions or bell peppers may only be cooked by himself.   (*Id.* at 19).   Lawrence is providing Plaintiff with raw onions and bell peppers, and while his faith allows him to eat those vegetables raw, Plaintiff is concerned about his health due to eating only raw vegetables.   (*Id.* at 23). He seeks to be allowed to cook the vegetables himself, either in the kitchen or in his cell. (*Id.* at 20).

Next, Plaintiff claims that when it comes to fruit, under the Hebrew Israelite faith, he must eat "the natural fruit of the land".   (*Id.* at 25).   He states that he is mainly provided canned fruit and is never provided fresh fruit.   (*Id.* at 24, 25).   There would be no issue, according to Plaintiff, if he was provided canned fruit only some of the time;

however, the fact that he is only provided canned fruit violates his faith.   (*Id.* at 24).

Sixth, Plaintiff claims that the dietary area where his meals are prepared is "horribly unclean."   (*Id.* at 25).   He claims that there are maggots, roaches, flies, and rodent droppings in dietary.   (*Id.*).   The uncleanliness of dietary violates his faith.   (*Id.* at 25 – 26).   Plaintiff testified, however, that he has never been to the kitchen.   (*Id.* at 41).   Plaintiff has not actually seen maggots, mice, etc. in dietary; rather, these claims are based on conversations with inmate workers and "officers talking".   (*Id.* at 40).   He also claims a mouse ran past the warden's foot at some point.   (*Id.*).

Plaintiff's seventh claim relating to his food involves the use of plastic cups instead of Styrofoam.   Plaintiff claims that the plastic cups he receives cannot be sufficiently cleaned, which violates his faith, and Styrofoam cups, on the other hand, can be cleaned sufficiently.   (*Id.* at 26).   He also states that he is given spoons used by other inmates.   (*Id.*).

Finally, relating to his kosher diet complaints, Plaintiff claims that, at times, he will get a dietary tray that has a hole in the plastic seal.   (*Id.* at 27).   He states that this hole can cause the tray to become contaminated, and, therefore, no longer kosher.   (*Id.*).

To address Plaintiff's dietary claims, Jeremy Kohn, a Food Service Supervisor, testified on behalf of Defendants.   (Doc. 58, p. 40).   Mr. Kohn testified that, in order to keep the food preparation area in Lawrence clean, the tables are sanitized prior to preparing the food, and after the food is prepared, the tables are sanitized again.   (*Id.* at 41).   He acknowledged that there may be the occasional pest incident in dietary, but

that it is taken care of immediately by contacting maintenance to spray and perform pest control.   (*Id.* at 41 – 42).   Additionally, everything in dietary is wiped down with a bleach water solution in order to kill pests and bacteria.   (*Id.* at 42).   Mr. Kohn also testified that there are "air curtains" on all of dietary's doors.   (*Id.*).   The curtains blow air downward through the doorway in order to limit the number of flies traveling through the door.   (*Id.*).   Mr. Kohn acknowledged, however, that there is no way to totally eliminate any possibility of pests making their way in, and acknowledged that mice and maggots have been in the kitchen.   (*Id.* at 43).

Mr. Kohn also explained the preparation of the kosher trays as follows:

**A.**   The kosher trays that come as a prepackaged tray, we heat those up, and then we also offer them a lettuce salad mix, cut up onions, peppers, celery, and give them salad dressing.   And then their beverage is water, milk, or juice.

**...**

**A.**   … [The kosher tray] comes from the factory prepackaged.   We put it on aluminum foil and place it inside the oven to heat it up.

…

**A.**   … [W]e take [the kosher tray] out of the box prior to heating it up, and it has a plastic seal over the top of it.

**Q.**   What is the procedure for dealing with that seal?

**A.**   That when they receive the tray, they take it off themselves.

**...**

**THE COURT:**   Can I clarify that?   And this maybe isn't necessary.   So in other words, you get the prepackaged kosher meals with a seal on them, and the seals stay on and are taken off by the inmates through the entire process?

**THE WITNESS:**   Yes.

(*Id.* at 43, 44, 45).   Regarding the procedure for Saturday trays, Mr. Kohn indicated that they serve cold kosher trays on Saturdays.   (*Id.* at 50).   Without being asked about specifics or going into detail, he acknowledged that those trays are "prepared" on Saturdays.   (*Id.* at 50).

According to Mr. Kohn, the preparation of the kosher diet trays is overseen by a production supervisor, and the meals are prepared by a special diet cook who is an inmate.   (*Id.* at 45).   The special diet cooks are picked by the production supervisor, and, typically, they will be inmates who are better workers and more educated.   (*Id.*)   The inmates are not kosher certified, however.   (*Id.* at 49).

Mr. Kohn also addressed some specific food items that Plaintiff claims are not kosher.   Kohn testified that the salad mix came from a box with the kosher symbol on it, and the mix is taken out of a sealed container and placed on a tray by an inmate wearing gloves.   (*Id.* at 46).   He testified that the tuna and salad dressing both come from containers having the kosher symbol on them.   (*Id.* at 47).   As to the bagels and juice, Mr. Kohn indicated that those items were sent to Lawrence from Illinois Correctional Industries ("ICI"), and that he had been informed by an ICI representative that the items are kosher.   (*Id.*).   He did not know, however, whether the individuals preparing the bagels at ICI had kosher certification.   (*Id.* at 49).

As to the second matter at issue, Plaintiff also claims he is not provided Sabbath day services specifically tailored for Hebrew Israelites.   (Doc. 59, p. 28).   He states that

a Saturday service is a "keystone" to his faith.  (*Id.*).  While he has been allowed to attend a Friday service held by a separate group, the African Hebrew Israelites, Plaintiff testified that it violates his faith to worship with them due to differences in the faiths, as well as due to the fact that the service is held on a Friday.  (*Id.* at 29, 42; Doc. 58, p. 13 - 27)  Plaintiff also cannot participate in the Sabbath without taking part in a service. (Doc. 59, p. 45).

Plaintiff testified that he requested a Hebrew Israelite Saturday service, submitted the documentation to the chaplain at Lawrence, Chaplain Vaughn, and satisfied all of the necessary requirements.  (*Id.* at 53).  Among the requirements are to provide contact information for leaders of the faith outside the prison, as well as, provide the identity and credentials of the religious program volunteer who will conduct the service. (Doc. 50-1, p. 10 – 11).  While Plaintiff attempted to contact Hebrew Israelite groups outside of Lawrence regarding his desire for a Saturday service, he never received responses.   (Doc. 59, p. 56, 57).

Defendant Vaughn, the Lawrence Chaplain, testified as to his knowledge relating to Plaintiff's desire for a Hebrew Israelite Saturday service, as well as, the process for approving new services generally.   Once a request for a new service has been made to the chaplain, he will contact the chairperson of the IDOC religious advisory board by phone and explain the request.  (*Id.* at 76; Doc. 50-1, p. 11).   The chairman will then make a recommendation over the phone.  (Doc. 59, p. 76).  In regards to Plaintiff's request, the chairman advised Defendant Vaughn not to create a service because

Plaintiff had not identified outside faith leaders who could lead the service. (Doc. 58, p. 70). Defendant Vaughn agreed with this recommendation. (*Id.* at 112). No one from outside Lawrence has been identified as available to lead a Hebrew Israelite service, and though some religious groups hold services that are led by inmates, in Defendant Vaughn's view, there is no one inside Lawrence suitable to lead a service, including Plaintiff, due to his argumentative nature. (Doc. 58, p. 113; Doc. 59, p. 81 - 82).

An additional rationale for disallowing a separate Hebrew Israelite service was due to security and resource concerns. Defendant Vaughn testified that religious services can cause security issues within the prison, and that other religious services had been shut down due to such issues. (Doc. 58, p. 88, 89, 114). According to Defendant Vaughn, services for Odinism and the Moorish Science Temple were shut down due to gang-related problems. (*Id.* at 88, 89). Not surprisingly, prison guards are required to be present during a religious service. (Doc. 59, p. 64). Defendant Vaughn testified that whenever a service is added, it causes a strain on prison staff, which could allow for a weakness somewhere, in that staff would be unable to give their full attention to secure different areas of the facility. (Doc. 58, p. 116). Major Chad Jennings, a Correctional Shift Supervisor, also testified that officers at Lawrence may have two or three different assignments, and that assigning an officer to a new service would likely, at this time, take that officer away from other duties. (Doc. 59, p. 62, 66 – 67). Likewise, according to Defendant Vaughn, due to resource limitations, he simply cannot add another service. (Doc. 58, p. 116 – 17). When asked about the numerous nondenominational Christian

services and whether any of them could be consolidated, Defendant Vaughn testified that those services had already been consolidated and that there are still inmates who are not on a service.   (*Id.* at 118 – 17).   Major Jennings admitted, however, that if, for instance, two services were discontinued, two officers would theoretically be freed up. (Doc. 59, p. 68).

Finally, Plaintiff also claims he is not allowed to participate in certain celebrations and feasts as part of his faith.   Specifically, he seeks the following:

(a)   Pesach/Matzah (Passover-unleaven Bread):
      (1) Koshered diets with Matsoh (unleaven crackers) from April 23 - 30, 2016.
      (2) Services 1 ½ hours before sundown on April 22 for 1 ½ hours, 2016

(c)   Shavuot (Feast of Weeks):
      Services for 1 ½ hours before Sundown on June 11th and 12th and 13th, 2016.

(d)   Shabbaton Zecron Truah (Memorial Blowing of Trumpets): Services for 1 ½ hours before Sundown on October 2nd and 3rd and 4th, 2016.

(e)   Yom Kippur(iym) (Day of Atonement):
      (1) Services 1 ½ hours before Sundown on October 11th and 12th, 2016, for 1 ½ hours.
      (2) Double portion diets <u>after</u> service for 1 hour.

(f)   Sukkoth (Feast of Tabernacle):   Services for 1 ½ hours prior to Sundown on the 16th – 23rd for 1 ½ hours, 2016.

(Doc. 4, p. 2 – 3).

At the evidentiary hearing, Plaintiff reiterated that he seeks to participate in the events referenced above.   (Doc. 59, p. 29 – 30).   He further testified that the "main feast that [Lawrence] would have to accommodate…would be Passover…."   (*Id.* at 30).

Plaintiff also discussed the "double portion" diet he seeks for Yom Kippur.   He clarified the reason for seeking the special Yom Kippur diet:

> By us not eating for that entire day, we're just asking for a double portion diet, so it would be like giving us lunch and dinner at night.   It's not like we're getting some type of extra meal or something.

(*Id.*).   As for the celebrations, according to Plaintiff, like the Saturday services, due to the differences between the Hebrew Israelite faith and other Hebrew faiths such as the African Hebrew Israelite religion and "European" Judaism, Plaintiff is unable to celebrate his religious holidays with members of other Hebrew faiths.   (*Id.* at 31, 32, 33). For instance, Plaintiff testified that he cannot go to a Passover celebration with, as he put it, "European Jews" because they would be teaching him in a way that he does not agree with.   (*Id.* at 33).   Therefore, Plaintiff seeks separate Hebrew Israelite services to celebrate his holidays.   (Doc. 4, p. 2 – 3).

L<small>EGAL</small> S<small>TANDARDS</small>

**1.  Preliminary Injunction Standard**

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, **520 U.S. 968, 972 (1997).** *Accord Winter v. Natural Res. Def. Council, Inc.,* **555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right").**   To win a preliminary injunction, a plaintiff must show (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm without the injunction, (3) that the harm he would suffer is

greater than the harm a preliminary injunction would inflict on defendants, and (4) that the injunction is in the public interest.   *Judge v. Quinn*, **612 F.3d 537, 546 (7th Cir. 2010) (citing *Winter*, 555 U.S. at 20).**   The "considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted."   *Judge*, **612 F.3d at 546.**

In the context of prisoner litigation, there are further restrictions on courts' remedial power.   The scope of the Court's authority to enter an injunction in the corrections context is circumscribed by the Prison Litigation Reform Act (PLRA). *Westefer v. Neal*, **682 F.3d 679, 683 (7th Cir. 2012).**   Under the PLRA, preliminary injunction relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."   **18 U.S.C. §3626(a)(2).   *See also Westefer*, 682 F.3d at 683 (the PLRA "enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions:   prison officials have broad administrative and discretionary authority over the institutions they manage") (internal quotation marks and citation omitted).**

### 2.  First Amendment

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." **U.S. CONST. amend. I**.   The amendment has been incorporated to the states through the Fourteenth Amendment Due Process Clause, *Cantwell v.*

*Connecticut*, **310 U.S. 296, 303 – 04 (1940)**.   The Constitution's religious protections extend to incarcerated inmates; however, their rights are not absolute.   *Ortiz v. Downey*, **561 F.3d 664, 669 (7th Cir. 2009)**.   In the First Amendment context, a prisoner's right to freely exercise his religion "does not depend on his ability to pursue each and every aspect of the practice of his religion."   *Canedy v. Boardman*, **91 F.3d 30, 33 (7th Cir. 1996) ("*Canedy II*")**.

In order to prevail on a claim under the Free Exercise Clause, a plaintiff must demonstrate that his right to practice his chosen religion was "burdened in a significant way."   *Kaufman v. McCaughtry*, **419 F.3d 678, 683 (7th Cir. 2005)**.   However, unlike RLUIPA, discussed below, a prison practice or policy will not violate the First Amendment if it is one of "neutral and general applicability", *see Koger v. Bryan*, **523 F.3d 789, 797 (7th Cir. 2008)**; *see also Mark v. Gustafson*, **286 Fed.Appx. 309, 312 (7th Cir. 2008)**, or where the policy or regulation was reasonably related to a legitimate penological objective, *Kramer v. Pollard*, **497 Fed.Appx. 639, 642 (7th Cir. 2012)**; *Maddox v. Love*, **655 F.3d 709, 719 (7th Cir. 2011)**; *Ortiz v. Downey*, **561 F.3d 664, 669 (7th Cir. 2009)**.

3.  **RLUIPA**

RLUIPA prohibits prison officials from imposing a "substantial burden on the religious exercise of a person" unless the prison can demonstrate that the burden is "in furtherance of a compelling governmental interest" and is also "the least restrictive means of furthering that compelling governmental interest."   **42 U.S.C. § 2000cc(a)(1)**.

"Religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* **at § 2000cc-5(7)(A)**. The exercise sought must be based on a sincerely held religious belief and not some other motivation. ***Holt v. Hobbs*, 135 S.Ct. 853, 862, 190 L.Ed.2d 747 (2015) (citing *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2774, n. 28, 189 L.Ed.2d 675 (2014))**. Under RLUIPA's burden shifting regime, initially, a plaintiff has the burden to demonstrate that his exercise of religion has been substantially burdened. ***Holt*, 135 S.Ct. at 862, 63**. A substantial burden exists if a state action or prohibition "seriously violates" an inmate's religious beliefs. ***Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015) (quoting *Holt*, 135 S.Ct. at 862)**. If a plaintiff meets his burden, the burden then shifts to the defendants to demonstrate both a compelling governmental interest and that the act or prohibition in question was the least restrictive means of furthering that interest. ***Holt*, 135 S.Ct. at 863**. As RLUIPA provides "greater protection" than that provided by the First Amendment, *see id*, **at 862**, the undersigned first addresses Plaintiff's RLUIPA claims, and should Plaintiff fail on those claims, there is no need to address to Free Exercise claims.

**ANALYSIS**

### 1. Kosher Diet

Plaintiff has failed to meet his burden to clearly demonstrate that he is entitled to a preliminary injunction on any of his issues with his kosher diet. The closest Plaintiff comes to demonstrating that an injunction should be issued is in regards to when the

Saturday trays are prepared.  Plaintiff states that the trays must be prepared before sundown on Friday in order to be kosher and not violate his faith.   It is true that Food Service Supervisor Kohn testified that the Saturday trays are indeed prepared on Saturday.  Mr. Kohn also testified that the trays are served cold, however.  Plaintiff, having the opportunity, nonetheless, did not ask Mr. Kohn to explain specifically what he meant by "prepared."   According to Mr. Kohn, typically, the pre-packaged portion of the tray is "prepared" by heating it up, and then, separately, vegetables are mixed together to create a salad.   Since the Saturday trays are not heated up, however, the only portion of the Saturday meal that might be "prepared" on Saturday is the salad.   Mr. Kohn testified that the salad was prepared by dumping the lettuce mix out of its container onto the tray, chopping up vegetables, and adding those vegetables to the salad mix.   If they are indeed doing it, Lawrence officials *could* be substantially violating Plaintiff's rights by preparing the Saturday salad in such a way.   It is not entirely clear that Lawrence is preparing the Saturday salad in that manner, or at all, however. Further, the risk of irreparable harm to Plaintiff on this issue is low.   If Lawrence dietary is preparing Plaintiff's Saturday salad after sundown on Friday, then Plaintiff has the option to not eat the salad and still eat the rest of the tray that is not "prepared" on Saturday.   Forgoing salad one day a week would cause Plaintiff little, if any, harm.[1]

---

[1] If an injunction were to issue, it would be to order Lawrence to prepare Plaintiff's Saturday salad before sundown on Friday.   Therefore, presumably, Lawrence dietary would prepare the salad Friday afternoon and refrigerate it for over 12 hours, thus allowing it to wilt, before providing it to Plaintiff.   Plaintiff is therefore either going to get a wilted salad on Saturday or no salad at all.   Either way, it is not possible for him to receive a fresh salad on Saturdays.

Plaintiff has also failed to demonstrate that the harm to him caused by his trays being prepared by those who are not Torah-adherent outweighs the burden an injunction would have on Defendants.   An injunction satisfying Plaintiff's beliefs would require the Court to order that Lawrence use a Torah-adherent inmate to prepare Plaintiff's food.   Lawrence, reasonably, has standards as to what inmates it will allow to prepare food in dietary, and Plaintiff has not set forth any evidence demonstrating that there are suitable Torah-adherent inmates.   The Court cannot order Lawrence to use a particular type of inmate to prepare Plaintiff's food if no such suitable inmate exists, and Plaintiff has not demonstrated that there are any Torah-adherent inmates who are qualified to prepare food in Lawrence dietary.

Additionally, there is not sufficient evidence to demonstrate that certain specific food items singled out by Plaintiff are not kosher.   Plaintiff's claims that the bagels and juice on his tray are based on hearsay, and his claim that the tuna is not kosher is based on a supposed statement from an unknown supervisor who did not testify.   Mr. Kohn, on the other hand, who works in dietary, testified that the tuna comes from a container with the kosher symbol on it.   It is true that Mr. Kohn's assertions that the bagel and juice are kosher is based on hearsay evidence from an individual at ICI.   Nonetheless, at the preliminary injunction stage, the burden is on Plaintiff to demonstrate he is likely to succeed on the merits, and his own hearsay testimony as to the juice and bagels is not sufficient to demonstrate a likelihood of success.

Similarly, Plaintiff's claims as to the uncleanliness of Lawrence dietary also fail to

demonstrate a need for injunctive relief.   As with his claims regarding the specific food items on his tray, Plaintiff's claims that Lawrence dietary is dirty and infested with various pests is based on hearsay testimony, some of it likely inadmissible.   Mr. Kohn, on the other hand, testified from first-hand knowledge that Lawrence dietary is regularly cleaned, precautions for pests are taken, and if any pests are identified they are dealt with immediately.   The undersigned finds Mr. Kohn highly credible.   Clearly, as Mr. Kohn testified, it is almost impossible to prevent all pests out of any given place at all times.   The evidence suggests, however, that Lawrence dietary staff are doing all that they can to keep pests out of the dietary area and to keep the area clean.   Plaintiff has not presented sufficient evidence to the contrary, and he has not demonstrated that he is likely to succeed on the merits of this issue.

Plaintiff is also not likely to succeed on the merits of his claim relating to the serving of raw onions and bell peppers.   The best the undersigned can tell, his position can basically be summed up as follows: Plaintiff may eat cooked vegetables only if he cooks it himself, and while he may eat raw vegetables, his health is at risk if the only vegetables he eats are raw.   Therefore, the position goes, the Court should order that Plaintiff be allowed to cook the vegetables himself, either in his cell or in the kitchen.

This position fails for two obvious reasons.   First, though the Seventh Circuit has held that an inmate's religious rights are substantially burdened when he is forced to choose between his religious practice and adequate nutrition, *see Nelson v. Miller*, **570 F.3d 868, 879 (7th Cir. 2009);** *Hunafa v. Murphy*, **907 F.2d 46 (7th Cir. 1990)**, here Plaintiff

has failed to carry his burden in providing no evidence that he has suffered any adverse health effects from eating raw vegetables.   Second, Defendants have a clear and compelling interest in maintaining safety and security within Plaintiff's cell and in dietary, *see Andreola v. Wisconsin*, **211 Fed. Appx. 495, 498 – 99 (7th Cir. 2006) (noting previous findings that security within a prison is a compelling state interest and applying it to jails) (citing** *Borzych v. Frank*, **439 F.3d 388, 390 – 91 (7th Cir. 2006);** *Reynolds v. City of Anchorage*, **379 F.3d 358, 362 (6th Cir. 2004);** *Holly v. Woolfolk*, **415 F.3d 678, 679 (7th Cir. 2005))**, and not allowing Plaintiff to heat up food in his cell, nor allowing him access to the kitchen, is almost certainly to be found the least restrictive means in furtherance of that interest, given that the only cooked vegetables that Plaintiff may eat are those prepared by himself.

Under the record before the undersigned, Plaintiff's claims as to the canned fruit he receives also do not warrant a preliminary injunction.   Plaintiff states his faith would not be violated if he were given canned fruit merely some of the time.   A court, however, cannot issue an injunction ordering Lawrence to provide Plaintiff with fresh fruit "most of the time".   The Federal Rules of Civil Procedure require courts to "specifically" state the terms of an injunction, and to "describe in reasonable detail…the act or acts restrained or required."   FED.R.CIV.P. 65(d)(1)(B) & (C).   In other words, an injunction must clearly indicate what it is the Defendant is to do or not do.   Based on the current record regarding the canned fruit served to Plaintiff, a court cannot issue an injunction that would comply with Rule 65(d).   *See Schmidt v. Lessard*, **414 U.S. 473**

**(1974) (district court injunction merely providing relief "against further enforcement of the present Wisconsin scheme against" Plaintiffs did not comply with Rule 65(d))**. Moreover, Plaintiff has provided no evidence as to the burden, or lack thereof, on the part of Defendants to provide him with fresh fruit.

Nor has Plaintiff presented sufficient evidence as to the uncleanliness of the plastic utensils and cups.   He provides nothing other than conclusory allegations that the plastic cups and utensils are not able to be sufficiently cleaned or are not cleaned after use by other inmates.   The undersigned cannot say that Plaintiff is likely to succeed on the merits of his claims in this matter.

Finally, a court cannot issue an injunction as to Plaintiff's complaints of holes in the seal on his trays.   Plaintiff testified that these holes occurred in the past, but there is no evidence to indicate whether the breakage in the seals were either intentional or inadvertent.   More importantly, there is no evidence to suggest that any of Plaintiff's future trays are likely to suffer holes in their seals.   Plaintiff has not demonstrated that he is likely to suffer irreparable harm absent the issuance of any sort of injunction on this issue.

### 2.  Sabbath Services

A preliminary injunction is also not appropriate as to Plaintiff's claim seeking a separate Hebrew Israelite service on Saturdays.   Plaintiff has failed to demonstrate he likely to succeed on the merits of his Sabbath service claims.

Though there was a great deal of testimony (not cited above) surrounding the

differences or similarities between Plaintiff's Hebrew Israelite faith and the African Hebrew Israelite faith, the services of which he has been allowed to attend, the undersigned finds other evidence to be dispositive of the question of injunctive relief on this issue.   Therefore, the undersigned assumes, for the purposes of the motion at bar, that Plaintiff's religious rights are substantially burdened by the fact that he is unable to participate in a separate Hebrew Israelite service taking place on Saturdays.   As such, on the merits of an RLUIPA claim, the burden then falls on the Defendants to demonstrate that not providing Plaintiff with a separate Saturday service is the least restrictive in furtherance of a compelling government interest.   Of course, since the matter at issue here is Plaintiff's motion for a preliminary injunction, the burden falls on Plaintiff to demonstrate the lack of a compelling government interest or that Defendants' refusal to provide a service is not the least restrictive means in furtherance of such an interest.

Plaintiff cannot meet his burden.   Defendants' evidence demonstrates that their refusal to allow Plaintiff to hold his own separate Saturday service stems ultimately from security concerns.   As already discussed, Defendants have a compelling interest in security at Lawrence.   *See Andreola, supra*.   Plaintiff has not demonstrated that the refusal to allow a separate Hebrew Israelite service on Saturday is not in furtherance of that interest.   The testimony of Defendant Vaughn and Major Jennings indicate that Plaintiff's request for a service was denied because there were not appropriate individuals in place to lead the service and because of staffing concerns.   Clearly, any

group activity in a prison must be led by an appropriate individual, as prison officials must be particularly sensitive to gang-related issues, as well as, the incitement of violence and other criminal acts, which could arise out of groups of inmates congregating together.   Additionally, Defendant Vaughn and Major Jennings raised concerns indicating that pulling staff from other duties to cover Plaintiff's service could lead to staffing shortages in other areas of the facility, thus potentially leading to security issues.   The undersigned finds the testimony by Defendant Vaughn and Major Jennings on these issues to be credible and sound.   Plaintiff failed to produce credible evidence to refute this testimony.

Nor has Plaintiff demonstrated that the refusal to provide a Hebrew Israelite service is not the least restrictive means in furtherance of Lawrence's interest in security. For his part, Defendant Vaughn attempted to accommodate Plaintiff by allowing him to attend the African Hebrew Israelites' service on Friday.   It is clear to the undersigned, however, that nothing short of a separate Hebrew Israelite service will satisfy Plaintiff. Therefore, there is no less restrictive action that would allow Defendants to address their security concerns and satisfy Plaintiff.   In his questioning of Major Jennings, Plaintiff suggested that Defendants could cancel two of the other services to free-up guards to cover his service.   Defendant Vaughn testified, however, that the nondenominational Christian services had already been consolidated, and, in any event, the undersigned will not recommend that Plaintiff be given a service at the expense of those attending an already established religious service.   Such an action is not any less restrictive than

simply refusing to provide Plaintiff his service.   Plaintiff simply has failed to demonstrate he is likely to succeed on the merits of his RLUIPA claim in this matter.

The undersigned's findings today are in line with how the Supreme Court has interpreted RLUIPA.  The High Court has stated that it does "not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety."  ***Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005)**.   The Court has noted that "context matters" in applying RLUIPA.  ***Id.* at 722 – 23 (quoting *Grutter v. Bollinger*, 539 U.S. 306 (2003) (internal quotations omitted))**.   Its expectation is that RLUIPA will be applied "in an appropriately balanced way, with particular sensitivity given to security concerns."  ***Cutter*, 544 U.S. at 722**.   In the case at bar, a preliminary injunction on the issue of Sabbath services is not appropriate, particularly in light of the associated security concerns.

### 3.  Celebrations and Feasts

Finally, Plaintiff has also failed to demonstrate that he is entitled to a preliminary injunction relating to the celebrations and feasts he seeks.  Plaintiff seeks a separate service for each of the holidays he lists in his motion; however, he has not provided any evidence regarding the extent of the burden on Defendants to provide these services. Plaintiff's "evidence" essentially amounts to listing the celebrations he wishes to engage in.   In fact, the evidence as to the effect on Lawrence's security and resources caused by adding a regular Saturday service suggests that the Defendants could suffer a significant burden if required to facilitate an extra Hebrew Israelite service for each of the holidays

referenced by Plaintiff.   Plaintiff has failed to provide, however, evidence that would allow the undersigned to weigh the harm to him of not being allowed to participate in separate celebrations against the burden of requiring Lawrence officials to establish these separate celebrations for him.   Further, Plaintiff has failed to present evidence relating to the burden on Defendants to provide him with the food for the feasts associated with the celebrations.

In addition, the undersigned will not recommend an injunction requiring Lawrence officials to provide Plaintiff with a double portion of food on the evening of Yom Kippur.   Though the burden on Defendants to do so may be small, Plaintiff has failed to demonstrate that, under RLUIPA, his faith is substantially burdened by not receiving a double food portion on Yom Kippur, and therefore he has not demonstrated that he is likely to succeed on the merits of this particular issue.   Plaintiff's testimony did not demonstrate that his religious exercise would be "seriously violat[ed]" by failing to receive a double portion of food on Yom Kippur.   *See Holt*, **135 S.Ct. at 862 (quoting** *Hobby Lobby*, **134 S.Ct. at 2775) (internal quotations omitted)**.   His testimony does not suggest that a double portion of food in the evening is an integral part of Yom Kippur. Rather, Plaintiff testified that "[b]y us not eating for that entire day, we're just asking for a double portion diet," and, as such, he is asking to receive both his lunch and dinner at night.   This testimony suggests that Plaintiff seeks a double portion diet merely to make up for the fasting during the day.   It appears to the undersigned, however, that what is integral to Plaintiff's celebration of Yom Kippur is the act of fasting itself.   By not

receiving a double portion at night, Plaintiff is not prevented from fasting.   Rather, on his own volition, he can still make a sacrifice for his faith by refraining from food during the day, and still receive a regular meal at night.   In the undersigned's view, this scenario is in line with traditional notions of fasting.[2]   There is nothing in the record to indicate that Defendants are preventing Plaintiff from fasting during the day on Yom Kippur.   Moreover, it is unlikely that Plaintiff will suffer any true amount of harm from essentially (by choice) going without one meal on one day of the year.

Finally, Plaintiff's reliance on the Seventh Circuit's opinion in *Schlemm v. Wall* is misplaced.   In *Schlemm,* the Seventh Circuit reversed a district court's grant of summary judgment on an inmate's claim that prison officials were in violation of RLUIPA by denying the inmate, a Navajo, venison to eat as part of the Navajo Ghost Feast.   ***See generally, Schlemm v. Wall*, 784 F.3d 362 (7th Cir. 2015)**.   The procedural postures in the case at bar and in *Schlemm* are different, however.   While *Schlemm* was before the court on the defendants' summary judgment motion, ***Schlemm*, 784 F.3d at 364**, here, Plaintiff's case is before the Court on Plaintiff's Motion for Preliminary Injunction. Therefore, while the *Schlemm* defendants had the burden of demonstrating they were entitled to summary judgment, in this matter, the burden is on Plaintiff to demonstrate he is entitled to a preliminary injunction.   Quite simply, at this preliminary stage,

---

[2] The Oxford English Dictionary defines the verb "fast" as "[t]o abstain from food, or to restrict oneself to a meagre diet, either as a religious observance or as a ceremonial expression of grief."   **"fast, v.2."** *OED Online*.   **Oxford University Press, December 2016 (accessed February 3, 2017) <http://www.oed.com/view/Entry/68422#eid4803569>**.   Arguably, if Plaintiff were to receive two meals in the evening, he would not be truly "abstain[ing] from food" or restricting himself to a meager diet.

Plaintiff has not met his burden.

## CONCLUSION

Plaintiff has failed to meet his burden to clearly demonstrate that he is entitled to the extraordinary and drastic remedy of a preliminary injunction on his RLUIPA claims. Since Plaintiff has failed to demonstrate he is entitled to a preliminary injunction relating to RLUIPA, the undersigned need not examine his requests for injunctive relief in light of his First Amendment claims.   Therefore, the undersigned **RECOMMENDS** that Plaintiff's Motion for Preliminary Injunction be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties may object to any or all of the proposed dispositive findings in this Recommendation. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *See, e.g., Snyder v. Nolen*, **380 F.3d 279, 284 (7th Cir. 2004).** Accordingly, Objections to this Report and Recommendation must be filed on or before **February 24, 2017**.

**IT IS SO ORDERED**.
DATED: 2/6/2017

*/s/ Stephen C. Williams*
STEPHEN C. WILLIAMS
United States Magistrate Judge